UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TDS METROCOM, L.L.C., a Delaware
Limited Liability Company,

          Plaintiff/Counter-Defendant,

v.

MICHIGAN BELL TELEPHONE
COMPANY, a Michigan Corporation,
a/k/a SBC Ameritech Michigan,
a/k/a SBC Michigan,

          Defendant/Counter-Plaintiff.

_____/

File No.  5:05-CV-31

HON. ROBERT HOLMES BELL

## **O P I N I O N**

This case involves the interpretation of an agreement entered into between Plaintiff

TDS Metrocom, LLC ("TDS") and Defendant Michigan Bell Telephone Co. ("SBC").  The

principal dispute between the parties involves the scope of the agreement.  TDS contends that

the contract applies to all "term contracts" for telecommunication services.  SBC, on the other

hand, contends that the contract is limited to a specific subset of term contracts, namely those

that include local exchange service and/or toll service.  The parties also dispute whether a

notice provision contained in the contract is a condition precedent.  The parties have each

filed a motion for summary judgment on these issues as well as on TDS's equitable

subrogation claim.  TDS also seeks summary judgment on SBC's tortious interference with

a business relationship claim.  For the reasons that follow, the Court grants in part and denies in part both parties' motions for summary judgment.

I.

The relevant facts necessary to resolve this case are not in dispute.  TDS and SBC are telecommunication services companies.  TDS is a "competitive local exchange carrier" ("CLEC") that offers local, long distance, and enhanced telecommunication services to a variety of residential, business, and governmental customers in Michigan.  SBC is an "incumbent local exchange carrier" ("ILEC") that provides local exchange, toll and other telecommunication services.   Both SBC and TDS routinely enter into long term telecommunication contracts with their customers that offer discounted rates in exchange for the customer's commitment to purchase services for a specified time period.  These term contracts also contain provisions imposing early termination charges in the event the customer terminates the contract prior to the expiration date.

On January 29, 2003, in response to an offer by SBC, TDS and SBC entered into a "Mutual Waiver of Early Termination Fees Agreement" (the "Waiver Agreement") in which both parties agreed to waive the assessment of early termination fees in the event a customer terminated a term contract in order to subscribe to telecommunications services provided by the other party.  The Waiver Agreement was drafted by SBC and contained four recitals defining relevant terms followed by five numbered paragraphs setting out the parties' agreement.  The parties' agreement is set forth in the first numbered paragraph:

2

THE PARTIES AGREE AS FOLLOWS:

    1.    SBC and CLEC [TDS] agree that they will waive applicable Early Termination Fees under Term Contracts described in the Recitals above, said descriptions incorporated herein, in the event an end-user subscriber terminates the Term Contract before its stated expiration date in order to subscribe to telecommunications services in the State of Michigan provided by the other party.  This waiver is applicable to all Term Contracts rather than on a case-by-case basis.

The Waiver Agreement, Exhibit A, Def.'s Br. Summ. J. (Docket #19).  The definition of "Term Contracts" is set forth in the first recital of the agreement.  This definition is the focus of the parties dispute regarding the scope of the agreement. The first recital provides:

    WHEREAS, SBC and [TDS] have entered into term contracts with certain end-user subscribers for telecommunication service in the State of Michigan which include intraLATA and/or interLATA toll service, local exchange service, and/or associated features, under which such subscribers may receive [sic] discount based upon the volume of services used or agreed to be used, length of term and other factors ("Term Contracts");

The Waiver Agreement, Exhibit A.  The agreement also contains a notice provision that is relevant to this dispute.  The notice provision states:

    In order to facilitate implementation, and avoid billing end-users for termination charges subject to this agreement, each party shall provide written notice to the other party not less than seven (7) days before switching the local or toll service of an end-user having a Term Contract with the other party.

The Waiver Agreement, Exhibit A.

In April 2003, SBC modified the agreement by changing the person to whom notification of a customer switch should be provided.  *Compare* Jan. 29, 2003 Waiver Agreement, Exhibit A (specifying "Craig Anderson" as notice contact) *with* April 2003

3

Waiver Agreement, Exhibit 4, Pl.'s Br. Summ. J. (Docket #17) (specifying "CIM Group" as notice contact).  The April 2003 version of the agreement also added a comma in the first recital that has become the focus of some attention in this case.[1]  *Compare* Jan. 29, 2003 Waiver Agreement ("SBC and [TDS] have entered into term contracts with certain end-user subscribers for telecommunication services in the State of Michigan which include . . . toll service, local exchange service, and/or associated features . . . .") *with* April 2003 Waiver Agreement ("SBC and [TDS] have entered into term contracts with certain end-users subscribers for telecommunication service in the State of Michigan**[,]** which include . . . toll service, local exchange service, and/or associated features . . . .").

After entering into the agreement, TDS began marketing its services to SBC customers, advising them that they would not incur early termination fees if they switched their telecommunication services from SBC to TDS.  Certain customers did switch their service from SBC to TDS.  SBC, however, assessed early termination fees on certain switching customers.  According to SBC, it assessed early termination fees in the following

---

[1]In addition to the insertion of the comma, there a few other, rather odd, modifications in the April 2003 version of the Waiver Agreement.  For example in the first recital defining Term Contracts, the term "end user subscribers" was changed to "end users subscribers."  In addition, in the second recital the tense of the word "obligation" was changed so that the sentence no longer makes sense. *See* Jan. 29, 2003 Waiver Agreement ("the Term Contracts may contain provisions *obligating* subscribers to pay certain charges, in the event they terminate the Term Contract before its stated expiration date."); Exhibit 4, April 2003 Waiver Agreement ("the Term Contracts may contain provisions *obligation* subscribers to pay certain charges . . . .") (emphasis added).  Finally, in the third recital, the word "not" is changed to "no" in the phrase "including, but not limited to," once again rendering it nonsensical.

4

situations: (1) the term contract at issue did not include local exchange service, toll service, and/or associated features; (2) SBC did not receive timely notice before contract termination; and/or (3) the term contract was not between SBC and a retail "end user."  TDS reimbursed the former SBC customers because TDS believed that SBC wrongly imposed the fees in violation of the Waiver Agreement.  This lawsuit followed.

II.

The standards upon which the Court evaluates a motion for summary judgment do not change simply because the parties present cross motions.  *Relford v. Lexington-Fayette Urban County Gov't*, 390 F.3d 452, 456 (6th Cir. 2004).  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts."  *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

III.

1.   *The Scope of the Waiver Agreement*

The first question the Court must resolve is whether the Waiver Agreement applies to all term contracts for telecommunication services or to a limited sub-set of term contracts that include local exchange service and/or toll service. Neither party contends that the language of the Waiver Agreement is ambiguous, however, they are diametrically opposed in their respective interpretations of that language. TDS asserts a broad interpretation of the agreement, contending that it applies to all term contracts for telecommunication services. Conversely, SBC interprets the Waiver Agreement narrowly, arguing that it only applies to term contracts that include local exchange service, toll service, and/or associated features.

The interpretation of a contract is a question of law for the Court. *See e.g.*, *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 463, 663 N.W.2d 447, 451 (2003). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties." *Fromm v. Meemic Ins. Co.*, 264 Mich. App. 302, 311, 690 N.W.2d 528, 533-34 (2004)

6

(quoting *McIntosh v. Groomes*, 227 Mich. 215, 218, 198 N.W. 954 (1924)).  To do so, the Court must read the agreement as a whole and apply the plain language of the contract itself. *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63, 620 N.W.2d 663, 666-67 (2000); *see also United Rentals (North America), Inc. v. Keizer*, 202 F. Supp. 2d 727, 735 (W.D. Mich. 2002) (Hillman, S.J.) ("The best evidence of the parties intent is the contract itself.").  When the language of a contract is clear and unambiguous, interpretation is limited to the actual words used and the Court must enforce the contract as written. *Wausau Underwriters Ins. Co. v. Ajax Paving Indus., Inc.*, 256 Mich. App. 646, 650, 671 N.W.2d 539, 542-43 (2003).

The scope of the Waiver Agreement is set forth in the first recital, defining "Term Contracts."[2]  It states that SBC and TDS have entered into "term contracts with certain end-user subscribers for telecommunication services in the State of Michigan which include . . . toll service, local exchange service, and/or associated features, under which such subscribers may receive discounts . . . ."  Exhibit A, The Waiver Agreement.  TDS contends this language was intended to cover *all* term contracts for telecommunication services.  TDS relies on the use of the broad term "telecommunication services," an expansive definition of the word "include," and certain grammatical rules to support its interpretation.

---

[2]The parties incorporated the recitals into the agreement by reference. *See* Exhibit A, ¶ 1.  The Michigan Supreme Court has held that in construing contractual language courts must consider and give meaning to all parts of a contract, including recitals. *See Acme Cut Stone Co. v. New Center Dev. Corp.*, 281 Mich. 32, 47, 274 N.W. 700, 705 (1937) (quoting *Thomson Electric Welding Co. v. Peerless Wire Fence Co.*, 190 Mich. 496, 505, 157 N.W. 67, 70 (1916)).

When the first recital is read in isolation, TDS's interpretation appears plausible. "Telecommunication service" is an undoubtedly broad term, encompassing all manner of services.  *See* MICH. COMP. LAWS § 484.2102(dd) (defining "telecommunication service"); 47 U.S.C. § 153(46) (same).  Further, the word "include" is often construed as a term of expansion, not limitation.  *See Michigan Bell Telephone Co. v. Dept. of Treasury*, 445 Mich. 470; 518 N.W.2d 808 (1994) ( "[W]here a term is defined by declaring what it "includes," it is susceptible to extension of meaning by construction.  When used in a statutory definition, the word "includes" is a term of enlargement, not of limitation.") (citation omitted).  And, finally, according to the rules of grammar the phrase "which include . . . toll service, local exchange service, and/or associated features," is a nonrestrictive clause that does not serve to narrow or define "term contracts," but simply adds parenthetic information. *See* CHICAGO MANUAL OF STYLE, 5.202, 6.38 (15th ed. 2003); WILLIAM STRUNK JR. & E.B. WHITE, THE ELEMENTS OF STYLE, 59 (4th ed. 2000).[3]  Each of these factors lend support to TDS's interpretation of the Waiver Agreement.  Nevertheless, the Court cannot read the first recital in isolation, but must read the agreement as a whole in order to effectuate the overall intent of the parties.  *See Perry v. Sied*, 461 Mich. 680, 689 n. 10; 611 N.W.2d 516 (2000)

---

[3]TDS's argument based upon the rules of grammar gains some strength when the April 2003 version of the Waiver Agreement is reviewed.  In this version, a comma has been inserted between "State of Michigan" and "which include." *See* Exhibit 4, April 2003 Waiver Agreement.  According to the Chicago Manual of Style, a nonrestrictive clause is both preceded and followed by a comma.  CHICAGO MANUAL OF STYLE, 6.38.

("contracts are to be interpreted and their legal effects determined as a whole.") (citing 3 CORBIN, CONTRACTS, § 549, 183-86).

When the Waiver Agreement is read as a whole, it is clear that the parties intended to limit the scope of the agreement to term contracts that included local exchange service or toll service only.  This is readily apparent when the first recital is read in conjunction with the rest of the agreement, particularly the notice provision.  The notice provision requires that each party give written notice "before switching the local or toll service of an end-user having a Term Contract with the other party."  Exhibit A, The Waiver Agreement.  The fact that no other type of telecommunication service is mentioned in the notice provision strongly indicates that the Waiver Agreement is limited to these two specific services.  Moreover, the fact that toll and local exchange service are the only services specifically mentioned in the entire Waiver Agreement lends additional support to the conclusion that the Waiver Agreement is limited to these services.

Reading the notice provision in light of TDS's view would mean that the parties were only required to provide notice when switching either toll or local exchange service but were free to switch a host of other telecommunications services without prior notice to each other.  Such an interpretation does not make sense and must be rejected, *see United Rentals (North America), Inc.*, 202 F. Supp. 2d at 735 ("[I]n construing the contract, the court must adopt the construction that will result in a reasonable, fair, and just contract, as opposed to one that is unusual or extraordinary or produces unfair or unreasonable results.") (citing *Port Huron*

9

*Area Sch. Dist. v. Port Huron Educ. Ass'n*, 120 Mich. App. 112, 327 N.W.2d 413 (1982)), especially when the parties have specifically stated in the agreement that the goal of the notice provision is "to facilitate implementation, and avoid billing end-users for termination charges subject to this agreement."   Under TDS's interpretation, the difficulty in implementing the agreement and the likelihood that customers would be unnecessarily billed for early termination charges that are subject to the Waiver Agreement would increase, rendering the notice provision essentially meaningless.   The Court cannot accept an interpretation of the agreement that would lead to such a result. *Klapp*, 468 Mich. at 468, 663 N.W.2d at 453 ("Courts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory.").   The better view, which gives effect to each term of the contract, is that the Waiver Agreement is limited to term contracts containing "toll service, local exchange service, and/or associated features."   Therefore, based upon a review of the entire Waiver Agreement, it is clear that the parties' intended that the Waiver Agreement be limited in scope to term contracts containing local exchange service or toll service only.

Moreover, TDS's arguments in support of its interpretation ultimately fall short. While "telecommunication service" is a broad term, in the context of the Waiver Agreement, it is used merely to indicate the subject matter of the contract.   The Waiver Agreement involves specific types of "telecommunication service," as opposed to other services offered by the companies.   Further, while "include" can be read as a term of expansion, it can also

be read as a term of limitation "and the word in and of itself is not determinative of how it is intended to be used." *Frame v. Nehls*, 452 Mich. 171, 178-79; 550 N.W.2d 739, 742 (1996) (citing *Belanger v. Warren Consol. School Dist. Bd. of Ed.*, 432 Mich. 575, 587, n. 25; 443 N.W.2d 372 (1989)); *see also Cloverdale Equipment Co. v. Manitowoc Engineering Co.*, 964 F. Supp. 1152, 1159 n. 6 (E.D. Mich. 1997) (quoting *Nelson v. Kendrick*, 187 Mich. App. 367, 370, 466 N.W.2d 402 (Mich. App. 1991)).  Based upon a review of the entire contract, it is clear that, as used in the first recital, "include" was intended to be read as a term of limitation.  Finally, while reference to the rules of grammar can assist the Court, it cannot take the place of the Court's central task in a contract dispute of determining the parties' intent.[4]  The Court is not charged with the task of grading the grammatical choices made by the drafter but must determine the intent of the parties from the words used.  *See e.g.*, *Old Kent Bank*, 243 Mich. App. at 63, 620 N.W.2d at 666-67.  While the grammatical skill of the SBC attorney who drafted the Waiver Agreement leaves much to be desired and injects unnecessary complexity into this matter, it is still clear that the contract was intended to be limited to term contracts containing toll service and/or local exchange service.  *See Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel*, 460 Mich. 558, 567; 596 N.W.2d 915, 919

---

[4]Moreover, TDS places far too much emphasis on the insertion of the comma between "State of Michigan" and "which include . . ." in the April 2003 version of the Waiver Agreement.  Rather then indicating the parties' intent, the stray comma and the other grammatical changes, *see supra* note 1, are simply more evidence of SBC's sloppy drafting.

(1999) ("If a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous, or indeed fatally unclear.").

At best, the various arguments put forth by TDS indicate that the Waiver Agreement is ambiguous. *See, e.g., Guerrant v. Roth*, 777 N.E.2d 499, 503 (Ill. App. Ct. 2002) (concluding that the word "include" was susceptible to two reasonable interpretations, thus contract was ambiguous). In that event, the Court may look to relevant extrinsic evidence to clarify the meaning of the contract. *See Stine v. Cont'l Cas. Co.*, 419 Mich. 89, 112, 349 N.W.2d 127 (1984).

SBC has provided the Court with an "Accessible Letter" dated January 15, 2003 informing CLECs in Michigan, including TDS, that SBC was willing to enter into mutual waiver agreements. Exhibit B, Def.'s Res. Br. (Docket #19). The language of the Accessible Letter is consistent with the language of the Waiver Agreement in all material respects and reinforces the conclusion that the contract was limited to term contracts for local exchange or toll service. *See Union Oil Co. v. Newton*, 397 Mich. 486, 488, 245 N.W.2d 11, 12 (1976) (holding that extrinsic evidence that is consistent with written contractual language does not violate the parol evidence rule). The Accessible Letter makes clear that the waiver of early termination fees would be limited to contracts for local exchange service, toll service, and associated features.

For example, the first paragraph of the letter states: "[SBC] is willing to enter into agreements with CLECs under which the parties will mutually agree to waive early

12

termination fees . . . *under term contracts for the provision of local exchange service, toll service or both when an end-user switches local exchange service, toll service or both to the other carrier.*" Jan. 15, 2003 Accessible Letter, Exhibit B (emphasis added). Then, in the third paragraph, the limited scope of the waiver agreement is reiterated: "SBC is willing to enter into agreements with CLECs under which SBC and the CLEC will mutually agree to waive early termination fees otherwise applicable under *term contracts for certain telecommunication services* when the end-user switches *its local service, toll service or both* to the other carrier before expiration of the term." *Id.* (emphasis added). Finally, the letter unequivocally states "[t]he waiver is applicable to *all term contracts for any local exchange or toll service in Michigan*, rather than on a case-by-case basis." *Id.* (emphasis added).

TDS erroneously contends that the Accessible Letter is irrelevant because it is simply the unexpressed intentions of SBC. To the contrary, the Accessible Letter is the public offer that SBC extended to CLECs in Michigan, including TDS, to enter into mutual waiver agreements. TDS entered into the Waiver Agreement in response to receiving the Accessible Letter. *See* Exhibit C, Def.'s Res. Br. Thus, TDS cannot claim that the Accessible Letter amounts to SBC's unexpressed intentions.

Accordingly, the Court grants SBC's motion for summary judgment and denies TDS's motion on the issue of the scope of the Waiver Agreement. The unambiguous language of the contract limits the scope of the agreement to term contracts that contain toll service, local exchange service, and/or associated features.

In their motion SBC raised an additional issue regarding the scope of the agreement. SBC contends that it properly assessed early termination fees on customers who subscribed to Integrated Services Digital Network - Primary Rate Interface ("ISDN-Prime") service because this type of service does not fall under the term "local exchange service" covered by the Waiver Agreement.

The parties agree that the term "local exchange service" is a telecommunications term that is specifically defined in the Michigan Telecommunications Act ("MTA"), M.C.L. § 484.2101 *et seq.* Moreover, neither party disputes that when "local exchange service" was used in the Waiver Agreement it was intended to have the meaning set forth in the MTA. Nevertheless, the parties dispute whether ISDN-Prime service is a "local exchange service," and therefore covered by the Waiver Agreement.

This issue can be quickly resolved by reference to the definition of "local exchange service" in the MTA and subsequent caselaw interpreting that definition. Local exchange service is regulated by the Michigan Public Service Commission pursuant to the MTA. *See* Mich. Comp. Laws § 484.2201 (establishing the Michigan Public Service Commission's jurisdiction and authority to administer the MTA); § 484.2301-.2309b (regulating local exchange service). Section 2102(b) of the MTA provides: "'Basic local exchange service' or 'local exchange service' means the provision of an access line and usage within a local calling area for the transmission of high-quality 2-way interactive switched voice or data communication." Mich. Comp. Laws § 484.2102(b). After the Michigan Legislature

14

enacted the MTA, the Michigan Public Service Commission issued an opinion and order identifying certain telecommunications services that it deemed to be regulated services under the MTA.  *See* Exhibit O, Def.'s Reply Br. (Docket #26).  As part of its opinion, the Michigan Public Service Commission determined that in regulating basic local exchange service, the Legislature intended to reach "only those local services that are primarily provided only by the LECs and that are essential to the public health, safety, or general welfare of most customers."  *Id*. at 28.  In *In re Procedure and Format for Filing Tariffs under the Michigan Telecommunications Act*, 210 Mich. App. 533, 534 N.W.2d 194 (1995), however, the Michigan Court of Appeals determined that the Michigan Public Service Commission's definition of "basic local exchange service" was too expansive and inconsistent with the MTA.  210 Mich. App. at 542, 534 N.W.2d at 199.  The court determined that the Legislature intended to adopt a "minimal view" of "basic local exchange service," essentially "that basic local exchange service must be *basic*."  *Id*. at 543, 534 N.W.2d at 200 (emphasis in original).  While the court did not determine the precise limits of "basic local exchange service," it did conclude that the Legislature did not intend "to subsidize as 'basic' service an *expansive or highly sophisticated bundle of services*."  *Id*. at 543, 534 N.W.2d at 200 (emphasis added).

Unlike "local exchange service," ISDN-Prime is an unregulated service that provides a customer with a wide variety of telecommunication services in a bulk manner.  *See* Fennell Aff. ¶¶ 15, 16, Exhibit M, Def.'s Reply Br.  ISDN-Prime is provided through a DS-1

15

dedicated circuit.[5]  *Id.*  ISDN-Prime allows a customer to receive various types of voice telephone calls, including local, toll, toll-free (800), and wide area telephone services ("WATS"), as well as transfer and receive data through a computer.[6]  *Id.*  Clearly, based upon the wide variety of sophisticated services offered and the unregulated manner in which it is delivered, ISDN-Prime is not simply "local exchange service."  Rather it appears that ISDN-Prime is akin to the "expansive or highly sophisticated bundle of services" that the Michigan Court of Appeals has previously determined to be outside the definition of "basic local exchange service" under the MTA.  *In re Procedure and Format for Filing Tariffs under the Michigan Telecommunications Act*, 210 Mich. App. at 543, 534 N.W.2d at 200.  Moreover, there is no indication that either party intended "local exchange service" to have a definition other than that provided under Michigan law.  Therefore, the term "local exchange service" in the Waiver Agreement does not include ISDN-Prime service.  Accordingly, the Court grants SBC's motion for summary judgment on this issue.[7]

---

[5]DS-1 is a high bandwidth circuit that allows the transportation of a greater amount of information through a circuit, and thus permits a customer to have services like video conferencing.  Fennell Aff. at ¶ 7-9.

[6]Toll service is regulated under the MTA at § 484.2312-.2312b.  Toll free 800 prefix services and WATS, however, are specifically identified as being unregulated services.  *See* MICH. COMP. LAWS § 484.2401(1).

[7]SBC also contends that it properly assessed early termination fees against customers who were not "end users."  It does not appear that non-end user customers are at issue in this case and both parties agree that the Waiver Agreement only applied to "end users."  Therefore, summary judgment will be entered in favor of SBC on this issue.

2.    *The Notice Provision*

The next issue involves the interpretation of the notice provision of the Waiver Agreement.  In addition to assessing early termination fees against customers who did not have local exchange or toll service, SBC also charged customers early termination fees because it did not receive timely prior notice of the customer switch.  TDS argues that these fees were erroneously charged because notice was not a condition precedent to waiver of the early termination fees.

The starting point for the Court's analysis is the parties' agreement.  Whether a provision is a condition depends upon the intent of parties, ascertained from a fair and reasonable construction of the contract.  *Knox v. Knox*, 337 Mich. 109, 118; 59 N.W.2d 108 (1953).  Absent language compelling the conclusion that a provision is a condition precedent, Michigan courts are not inclined to construe contractual language as a condition precedent.  *See Mikonczyk v. Detroit Newspapers, Inc.*, 238 Mich. App. 347, 350; 605 N.W.2d 360, 363 (1999).  The parties' agreed to the following:

> SBC and [TDS] agree that they will waive applicable Early Termination Fees under Term Contracts described in the Recitals above, said descriptions incorporated herein, in the event an end-user subscriber terminates the Term Contract before its stated expiration date in order to subscribe to telecommunication services in the State of Michigan provided by the other party.  This waiver is applicable to all Term Contracts rather than on a case-by-case basis.

Exhibit A, The Waiver Agreement ¶ 1.  This language clearly places a condition on the waiver of the Early Termination Fees, however, it is not prior notification of the switch.

Rather, the waiver is conditioned upon the termination of a Term Contract prior to the expiration date "in order to subscribe to telecommunication services in the State of Michigan provided by the other party."  This condition is evidenced by the use of the common conditional language "in the event" in the first sentence of the agreement.

In contrast, the following paragraph sets forth the notice requirement without any conditional language.  The notice provision provides:

> In order to facilitate implementation, and avoid billing end-users for termination charges subject to this agreement, each party shall provide written notice to the other party not less than seven (7) days before switching the local or toll service of an end-user having a Term Contract with the other party.

Exhibit A, The Waiver Agreement ¶ 2.  The plain language of this provision clearly indicates that waiver of the early termination fees was not conditional upon the giving of notice prior to the customer switch.  There is no indication that if a party failed to provide notice the duty to waive early termination fees would be excused.  Nor does the clause contain any language traditionally used to create a condition.  *See* 2 RESTATEMENT CONTRACTS, 2d § 226 (comment a) (noting that words such as "on condition that," "provided that," and "if" are often used to create a condition precedent).

SBC's reliance upon the phrase "shall provide" in the notice provision is misplaced.  While the use of "shall" indicates that notice is mandatory, it does nothing to support the claim that waiver of the early termination fee is conditional upon notice of the switch.  *See Mikonczyk*, 238 Mich. App. at 350; 605 N.W.2d at 363 (distinguishing between a condition and a promise).  The waiver provision merely sets forth the parties commitment to provide

18

each other with notice "in order to facilitate implementation, and avoid billing end-users for termination charges subject to this agreement."

Moreover, there is no indication in any other provision of the agreement that the duty to waive early termination fees was conditional upon the timely receipt of notice. In the paragraph preceding the notice provision, the parties' unequivocally agree to waive early termination fees when a customer switches from one company to the other. No other condition is placed upon this duty. In short, nothing in the Waiver Agreement compels the conclusion that timely notice was a condition precedent to the waiver of early termination fees. *Mikonczyk*, 238 Mich. App. at 350; 605 N.W.2d at 363.[8] Accordingly, TDS is entitled to summary judgment on this issue.

3. *Equitable Subrogation*

TDS has also asserted a claim for relief based on equitable subrogation. TDS contends that it should be equitably subrogated to the rights of SBC's former customers because it reimbursed these customers for early termination fees that SBC assessed against

---

[8]SBC's citation of *Au Rustproofing Center, Inc. v. Gulf Oil Corp.*, 755 F.2d 1231 (6th Cir. 1985), in support of its position is inapposite. In *Au Rustproofing*, the Sixth Circuit, construing a contract governed by Ohio law, held that an oil company's claim of repayment for certain loans to a retailer was precluded because it had failed to comply with a contractual notice condition precedent. Unlike this case, however, the contract at issue in *Au Rustproofing* specifically used conditional language when describing the notice requirement, "in the event that [the retailer] breaches any other agreements with Gulf, Gulf may at its option terminate all agreements . . . by giving ten (10) days prior written notice . . . *in which event* [retailer] shall pay to Gulf . . . [the site improvement loans]." 755 F.2d at 1234 (emphasis added). No such conditional language was used in the notice provision at issue in this case.

19

them.  SBC assessed early termination fees in two relevant situations: (1) the customer's term contract did not include local exchange service, toll service, or associated features and (2) SBC did not receive timely notice prior to a customer switching its service from SBC to TDS.  TDS is not entitled to equitable subrogation in either circumstance.

"Equitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other." *Auto-Owners Ins. Co. v. Amoco Prod. Co.*, 468 Mich. 53, 59, 658 N.W.2d 460 (2003) (quoting *Commercial Union Ins. Co. v. Med. Protective Co.*, 426 Mich. 109, 117, 393 N.W.2d 479 (1986)).  Equitable subrogation is a flexible doctrine, the application of which proceeds on a case-by-case analysis.  *Hartford Acc. & Indem. Co. v. Used Car Factory, Inc.*, 461 Mich. 210, 215, 600 N.W.2d 630, 632 (1999).  It is most often applied when there is a contractual or insurance relationship by one party to pay a third party. *See In re Lewis*, 398 F.3d 735, 748-49 (6th Cir. 2005) (Carr, J., concurring) (collecting cases), *Eller v. Metro Indus. Contracting, Inc.*, 261 Mich. App. 569, 573, 683 N.W.2d 242, 245 (2004).  But the Michigan Supreme Court has stated that"the mere fact that the doctrine of subrogation has not been previously invoked in a particular situation is not a prima facie bar to its applicability." *Hartford Acc. & Indem. Co.*, 461 Mich. at 216, 600 N.W.2d at 632. Nevertheless, a court should exercise caution in determining whether equitable subrogation should be applied in a new context.  *Id.*; *see also Beaty v. Hertzberg & Golden, PC*, 456 Mich. 247, 254 n. 5; 571 N.W.2d 716 (1997).

With regard to the customers who did not have local exchange service or toll service, TDS is not entitled to equitable subrogation because those customers were not within the scope of the Waiver Agreement, therefore, early termination fees were properly assessed against them. Consequently neither the customers, nor TDS through equitable subrogation, have a right to recover the fees from SBC. *See Hartford Acc. & Indem. Co.*, 461 Mich. at 215, 600 N.W.2d at 632 ("It is well-established that the subrogee acquires no greater rights than those possessed by the subrogor . . . .").

The customers who were wrongly assessed early termination fees based upon the failure to provide notice present a closer and more difficult question. In order to apply equitable subrogation, Michigan courts have looked to the presence of certain conditions including: (1) a special relationship between the subrogor and the subrogee in which the potential for conflicts of interest is eliminated; (2) the subrogee must lack any other available legal remedy; and (3) the subrogee must not be a "mere volunteer." *Hartford Acc. & Indem. Co.*, 461 Mich. at 215-16 (quoting *Beaty*, 456 Mich. at 254-55, 571 N.W.2d at 720). TDS has not alleged any special relationship between it and SBC's former (and TDS's new) customers. The relationship appears to simply be a commercial business relationship. Moreover, TDS was acting as a volunteer.

In order to avoid being a mere volunteer, the party seeking subrogation must have been acting to fulfill a legal or equitable duty owed to the subrogor. *See e.g., In re Lewis*, 398 F.3d at 749, *Hartford Acc. & Indem. Co.*, 461 Mich. at 216; 600 N.W.2d at 633. TDS

21

cannot show that it had any legal or equitable duty to pay the debt of SBC's former customers. SBC's former customers were obligated to pay the early termination fee based upon their term contract with SBC. Obviously, TDS had no obligation under the contract between SBC and SBC's customers. TDS contends, however, that it reimbursed the customers based upon the Waiver Agreement. TDS's reliance on the Waiver Agreement is misplaced. The Waiver Agreement did not obligate either party to reimburse the other companies' former customers. Rather, the Waiver Agreement obligated both TDS and SBC to waive early termination fees in the event one of their customers switched to the other company. Thus, for example, if a TDS customer switched its local exchange service to SBC, TDS was obligated to waive the applicable early termination fee provided for in the customer's term contract. But nothing obligates SBC, in the example, to reimburse TDS's former customer if the fee is not waived. Therefore, in the present case TDS cannot show that it had a legal or equitable duty to pay the debt of SBC's former customers. At best, it made a business decision to please its new customer. It did not act pursuant to a legal or equitable duty owed to the customer.

TDS relies upon *Eller v. Metro Industrial Contracting, Inc.*, 261 Mich. App. 569, 683 N.W.2d 242 (2004), in support of its claim that it did not act as a volunteer. A review of *Eller*, however, demonstrates why TDS is not entitled to equitable subrogation. In *Eller*, a contractor sought indemnification for damages arising from a construction site accident. 261 Mich. App. at 570, 683 N.W.2d at 244. The contractor had two identical indemnification

22

agreements with two different subcontractors. *Id*. at 571. One subcontractor fully indemnified the contractor. *Id*. The court held that by satisfying the full indemnification obligation, the indemnifying subcontractor was equitably subrogated to the contractor's rights against the other subcontractor for half of the judgment amount. *Id*. at 573, 683 N.W.2d at 246. The court determined that the subcontractor was not a volunteer because it provided for the contractor's defense and paid the judgment *pursuant to its indemnity agreement*. *Id*. Therefore, the subcontractor was fulfilling a legal duty owed to the contractor under the indemnity agreement.

The situation presented in this case is readily distinguishable from *Eller*. In *Eller*, the subcontractor fulfilled its legal duty under its indemnification agreement by paying the contractor's judgment debt. Therefore it was not acting as a volunteer. In this case, however, there is no contract obligating TDS to reimburse the former SBC customers for fees assessed pursuant to an agreement between SBC and its own customers. Therefore, unlike in *Eller*, TDS was acting as a volunteer.

Finally, the Court notes that the Michigan Supreme Court has indicated that courts should proceed with caution when determining whether to apply equitable subrogation in a new context. *Hartford Acc. & Indem. Co.*, 461 Mich. at 216, 600 N.W.2d at 632. The parties have not provided and the Court has not found any Michigan case extending equitable subrogation into a context analogous to the situation presented in this case. In light of this fact, the Court, especially when sitting in diversity, must resist extending equitable

subrogation into a new context. *See Combs v. International Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) ("[F]ederal courts 'must proceed with caution' when making pronouncements about state law.") (quoting *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092 (7th Cir. 1999)).

Accordingly, the Court grants SBC's motion for summary judgment and denies TDS's motion for summary judgment on TDS's equitable subrogation claim.

4.    *Tortious Interference with a Business Relationship*

The final issue presented in the parties' various motions for summary judgment is SBC's counterclaim for tortious interference with a business relationship. SBC contends that TDS unlawfully interfered with the contractual relationship between SBC and its customers by using the Waiver Agreement to directly solicit SBC's customers and induce them to breach their contracts with SBC. TDS has moved for summary judgment on this claim.

"One who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 131 (2002). The legitimate pursuit of a business interest through competition, however, is not actionable conduct. *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 96, 443 N.W.2d 451, 462 (1989); *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 376-77, 354 N.W.2d 341, 347 (1984).

24

TDS's conduct does not rise to the level of tortious interference.  SBC has done nothing more than allege that TDS engaged in advertising and direct solicitation of SBC's customers.  Such competitive conduct does not give rise to liability for tortious interference with a contract.  *Id.*  While in its counterclaim, SBC alleges that "[u]pon information and belief, TDS made misrepresentations to [SBC's] customers . . . ," Def.'s Counterclaim ¶ 8 (Docket #5), in response to TDS's motion for summary judgment SBC has not offered any evidence by way of affidavit or otherwise raising a genuine issue of material fact for trial.  *See* FED. R. CIV. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading," but the adverse party's response, by affidavits or [] otherwise . . . must set forth specific facts showing that there is a genuine issue for trial.").  As the non-moving party on this motion for summary judgment, SBC has the burden of coming forward with evidence raising a triable issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  SBC has not offered any evidence in support of its allegation and has not pointed to any specific facts raising an issue for trial on its tortious interference claim.  Further, SBC's brief allegation that discovery may provide evidence showing that TDS engaged in tortious conduct is not sufficient to overcome summary judgment because SBC has not complied with Rule 56(f) of the Federal Rules of Civil Procedure.  Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may

25

order a continuance to permit affidavits to be obtained or depositions to be
taken or discovery to be had or may make such other order as is just.

FED. R. CIV. P. 56(f).   "The importance of complying with Rule 56(f) cannot be
overemphasized."  *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000).  The
Sixth Circuit has interpreted Rule 56(f) to require that a party opposing a summary judgment
motion must "file an affidavit that 'indicate[s] to the district court its need for discovery, what
material facts it hopes to uncover, and why it has not previously discovered the information.'"
*Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir.
2003) (quoting *Cacevic*, 226 F.3d at 488).  SBC has not filed such an affidavit.  This failure
coupled with the lack of evidence raising a genuine issue of material fact on SBC's tortious
interference claim, results in the entry of summary judgment in TDS's favor.

## IV.

Accordingly, the Court grants in part and denies in part each parties respective motion
for summary judgment.  Summary judgment is granted in favor of SBC on the issue of the
scope of the Waiver Agreement and TDS's equitable subrogation claim.  Summary judgment
is granted in TDS's favor on the issue of interpretation of the notice provision and SBC's
counterclaim for tortious interference with a business relationship.  An order will be entered
consistent with this opinion.


Date:   __December 22, 2005__          /s/ Robert Holmes Bell
                                       ROBERT HOLMES BELL
                                       CHIEF UNITED STATES DISTRICT JUDGE